## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MAWUYRAYRASSUNA | : | |
| EMMANUEL NOVIHO, | : | |
| | : | |
| Plaintiff, | : CIVIL ACTION NO.: _____ | |
| | : | |
| LANCASTER COUNTY | : | |
| PENNSYLVANIA, SCOTT F. | : | |
| MARTIN, TODD E. BROWN, and | : | |
| CHRISTOPHER DISSINGER, | : JURY TRIAL DEMANDED | |
| | : | |
| Defendants. | : | |

## COMPLAINT

Plaintiff Mawuyrayrassuna Emmanuel Noviho, by his undersigned counsel, hereby complains of the above-named Defendants, as follows:

## I.    INTRODUCTION AND SUMMARY OF THE ACTION

1.     This is a civil rights action for damages brought by a young black male who lawfully emigrated from Togo, Africa to the United States approximately eight (8) years ago.  However, to further the personal, political and financial goals of a powerful Republican County Commissioner in Lancaster County, Defendant Scott Martin ("Martin"), Plaintiff Mawuyrayrassuna Emmanuel Noviho ("Noviho") was unlawfully charged with vehicular homicide and multiple related felonies concerning an automobile/tractor trailer crash that was, in fact,

caused by Martin's sister, Katie West ("West").  Tragically, West's husband and infant son were killed in the crash.

2.  At the time West rear-ended the tractor which Noviho was driving on State Route 222 in Lancaster County, Pennsylvania she was speeding and under the influence of heroin and other prescription medication.  Also, none of the four (4) occupants in her vehicle were properly belted or restrained as required by law, including West's two (2) minor children.  At no point in time before the crash did West attempt to brake or initiate any evasive action to avoid a collision.  Quite simply, she drove her car straight into the rear of Noviho's truck at approximately 70 miles per hour while under the influence of an illicit drug and another prescription medication.

3.  Rather than having his sister held accountable for her acts, Martin, and those acting in concert with him, caused criminal prosecutors and detectives under his direct political influence and control to bring felony charges against Noviho, not West, for, inter alia, homicide by vehicle and aggravated assault by vehicle.  Those charges, however, were based on knowingly false and irreconcilably conflicting statements of purported witnesses.  As set forth more fully below, Defendant Christopher Dissinger ("Dissinger), a long-time friend of Defendant Martin, was the lead detective on the seven (7) month "investigation" into the crash.  He was also a social media "friend" of West.  When Defendant

2

Dissinger appeared before a magisterial district judge, the Honorable David P. Miller, to obtain a warrant for Noviho's arrest, Defendant Dissinger intentionally concealed the highly relevant facts regarding West's role and culpability in the crash. Defendant Dissinger also failed to disclose any of the material exculpatory and/or contradictory evidence that was uncovered during the seven (7) month "investigation" that he conducted with and under the direction and supervision of Defendant Assistant District Attorney Todd E. Brown ("Brown").

4.     Despite the serious nature of the charges being "investigated" by Defendants Brown and Dissinger, as well as other local law enforcement officers, West did not engage criminal defense counsel like she did for her many prior drug-related arrests. Rather, within days of the crash, West and the Martin family engaged a prominent Philadelphia-based personal injury firm to prepare and prosecute civil actions on behalf of West, her husband and her two (2) minor children. Upon information and belief, West did not engage defense counsel because Defendant Martin knew that Lancaster County's District Attorney, Craig W. Stedman, a close friend and fellow Republican, would not prosecute West for these serious crimes. He was also comforted by the fact that the lead investigator, Defendant Dissinger, was a high school friend of his and a sports teammate. Their relationship today remains cordial and they follow each other on social media. Further, upon information and belief, Defendant Martin exercised his personal and

3

political influence over the District Attorney, Defendant Brown and/or Defendant Dissinger to charge Noviho in order to materially enhance the value of the above-referenced civil actions.  Noviho -- an emigrant from Togo, Africa with no similar political ties and/or high-profile friendships in the community -- was the unfortunate victim of this political conspiracy.

## II.    **PARTIES**

5.    Plaintiff Noviho is a competent adult individual residing at 388 Willow Bend Court, Newport News, Virginia 23608.

6.    Defendant Lancaster County, Pennsylvania ("Lancaster County") is a municipal corporation duly organized and existing under the laws of the Commonwealth of Pennsylvania with a business address of 150 N. Queen Street, Lancaster, Pennsylvania 17603.  At all times relevant hereto, the Lancaster County Commissioners, including Defendant Martin, established policies for and directed the affairs of Defendant Lancaster County.

7.    Defendant Martin is a competent adult individual residing in Lancaster County, Pennsylvania.  At all times relevant hereto, Defendant Martin served as an elected Lancaster County Commissioner and, in that capacity, is a duly authorized policymaker of Lancaster County.  Defendant Martin maintains a business address at 150 N. Queen Street, Seventh Floor, Suite 715, Lancaster, Pennsylvania 17603.

8.    Defendant Brown is a competent adult individual residing in Lancaster County, Pennsylvania.  At all times relevant hereto, Defendant Brown served as an Assistant District Attorney in Lancaster County, Pennsylvania. Defendant Brown maintains a business address at 50 North Duke Street, Fifth Floor, Lancaster, Pennsylvania 17608.

9.    Defendant Dissinger is a competent adult individual residing in Lancaster County, Pennsylvania.  At all times relevant hereto, Defendant Dissinger served as a Detective with the Manheim Township Police Department.  Defendant Dissinger maintains a business address at 1825 Municipal Drive, Lancaster, Pennsylvania 17601.

## III.   JURISDICTION AND VENUE

10.    This Court possesses jurisdiction over the claims set forth herein pursuant to 28 U.S.C. §§ 1331 and 1343.

11.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because a substantial part of the events and/or omissions giving rise to the claims set forth herein occurred in this district.

## IV.   FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

### A.   The Crash

12.    On November 12, 2012, Noviho was a truck driver for CR England, Inc.  On that date, Noviho was driving with another operator, Gregory Guerrier.

13.     At approximately 6:50 p.m. on Monday, November 12, 2012, Noviho was driving a 2012 Freightliner Cascadia northbound on Pennsylvania State Route 222 in Lancaster County, Pennsylvania.  Guerrier, his trainer, was in the passenger seat.  The conditions that evening were clear and dry.  The vehicle was not hauling a trailer.  Noviho and Geurrier were on their way to pick up a load for delivery.

14.     As Noviho was operating the vehicle, Guerrier noticed two switches on the tractor's dashboard in the off position; specifically, the airbag and axle differential switches.  Guerrier directed Noviho to pull over to the right hand shoulder of State Route 222 in order to flip the switches.  The tractor needed to come to a complete stop before that could be done.  The entire stop took less than thirty (30) seconds.  The headlights and taillights on the tractor remained on throughout the entire stop.

15.     After Noviho flipped the aforementioned switches, he turned on the vehicle's four way flashers and began to drive up the shoulder of the road in order to build speed to access the driving lane of State Route 222.  He did so and approximately 16 seconds after the tractor started moving, Noviho had accessed the right lane of State Route 222 traveling at approximately 17.5 miles per hour.

16.     At that same time, West, a known drug addict, was operating a 1996 Volkswagon Passat northbound on State Route 222 behind Noviho.  There were three (3) passengers in the Passat, Joshua West, West's husband who was also a

drug addict, Jocelyn West, West's daughter, and Joshua Charles West, West's infant son. None of the passengers were belted or properly restrained as required by law. Jocelyn West was on a booster seat that was not secured to the Passat, and Joshua Charles West was buckled into a car seat but the car seat was not secured to anything.

17.     As mentioned above, West was operating her vehicle at a rate of speed in excess of the posted limit. She was also driving under the influence of heroin and methadone. Her husband was also under the influence of morphine, if not heroin.

18.     As a result of the foregoing, West did not or could not pay proper attention to the roadway ahead and she drove her vehicle at 70 miles per hour straight into the rear of Noviho's tractor without attempting to brake or initiate any evasive maneuver. Noviho and Guerrier felt the violent impact after which Noviho slowly pulled over on the right shoulder of Route 222 and turned off the vehicle's lights and engine and waited for first responders to arrive.

19.     The violent collision was catastrophic to the Passat. After impact, the car flipped in the air and came to rest on its roof facing southbound in the northbound lane. Joshua West died at the scene from multiple traumatic injuries. The impact also violently propelled Joshua Charles West's unsecured car seat into the rear of the front right passenger seat causing depressed skull fractures and other

7

catastrophic injuries.   Although Joshua Charles West was removed from the vehicle and rushed to Lancaster General Hospital and then Penn State Hershey Medical Center, he died on November 12, 2012.   West suffered multiple injuries for which she has received treatment.   Jocelyn West, miraculously, was uninjured.

**B.     Crash Scene Activity and Initial Investigation**

20.     Noviho was stunned and shaken by the crash.   He stayed in the tractor resting his head in his hands on the steering wheel.   Shortly after the tractor pulled off the road, a woman and her husband (unknown to Noviho) arrived at the tractor to check on Noviho and Guerrier.   She told Noviho to remain in the tractor until medical personnel arrived.   She also told him that the vehicle that hit them was speeding and driving erratically.

21.     Manheim Township Police Officer David Onda next approached the tractor speaking first to Guerrier who advised the officer that they were struck from behind.   Guerrier indicated that he was not injured and Officer Onda then proceeded to check on Noviho.   When Noviho did not respond regarding his injuries, Officer Onda directed Noviho to remain in the tractor and then he would have an ambulance dispatched for him.

22.     Medical personnel quickly arrived at the crash scene.   Both Noviho and Guerrier were examined at the scene and transported to Lancaster General

8

Hospital for further evaluation and treatment.   West and her children were also transported to the same hospital.

23.    At approximately 8:20 p.m. on November 12, 2012, Defendant Dissinger approached Noviho at the hospital and asked Noviho if he could speak with him about the crash.   Noviho agreed and he briefly described the accident and gave Defendant Dissinger some information regarding the events of the day.   After Defendant Dissinger spoke with Noviho, Defendant Dissinger contacted Defendant Brown who directed him to get a blood sample from Noviho.   Dissinger requested Noviho's consent for the blood sample and Noviho agreed.   When the test results were obtained, they confirmed Noviho's statement to Defendant Dissinger that he was not under the influence of alcohol or any drug at the time of the crash.

24.    While Defendant Dissinger was interviewing Noviho, another Manheim Township Police Officer, Detective Robert Beck, requested permission to interview Guerrier.   Based on Defendant Dissinger's and Beck's interviews at the hospital, they were advised of and aware of, inter alia, the following:

> a. a woman told Noviho that the car that hit him was speeding and driving erratically;
>
> b. that there was a car proceeding northbound on State Route 222 about three (3) to four (4) car lengths ahead of them which was illuminating the road;
>
> c. that it was very dark outside and that Noviho was driving the tractor with the headlights and taillights activated;

9

otherwise they could not have seen where they were going; and

d. Noviho had pulled off State Route 222 in order to flip the above-referenced switches and that he was struck from the rear very shortly after accessing the driving lane of State Route 222.

These material facts, and many others, were ignored, concealed, omitted and/or withheld by law enforcement when the seven (7) month "investigation" was closed and charges were filed against Noviho.   In fact, during this extended "investigation", Defendant Martin and West's high-profile civil attorney met with various representatives of the District Attorney's office, including Stedman and Defendant Brown.    Again, upon information and belief, during this time, Defendant Martin and those acting in concert with him, lobbied for criminal charges to be filed against Noviho, not West and, in doing so, wrongfully abused their personal and political influence with Dissinger, Brown and Stedman.  The last meeting with Stedman and Brown was shortly before charges were filed against Noviho.  Again, those charges were filed for the purpose of enhancing the value of West's and the Martin family's now pending civil actions.

25.    On June 7, 2013, Defendant Dissinger presented an arrest warrant for Noviho, along with a supporting affidavit of probable cause, to Judge Miller for approval.  Both of those documents were prepared with the aid and assistance of Defendant Brown who lead, directed and/or supervised the seven (7) month

10

"investigation".  Judge Miller approved the request and Noviho was charged, as follows:

> Offense 1 – Homicide by Vehicle (2 counts)
>
> Offense 2 – Aggravated Assault by Vehicle (1 count)
>
> Offense 3 – Periods for requiring lighted lamps (1 count)
>
> Offense 4 – Minimum Speed Regulation (1 count)
>
> Offense 5 – Vehicular hazard signal lamps (1 count)
>
> Offense 6 – Moving stopped or parked vehicle (1 count)

26.    Unfortunately, Judge Miller made his decision based on a knowingly false and materially misleading affidavit of probable cause.  As set forth more fully below, had a truthful account of the crash been presented to Judge Miller, West, not Noviho, would have and should have been charged, and the value of the West-Martin family civil actions would have plummeted, perhaps to zero.

### C.    What a Fair and Impartial Judge Would Have Wanted to Know About the Crash Before Issuing an Arrest Warrant

27.    First, West was not travelling sixty-five (65) miles per hour at the time of the crash as represented by Defendant Dissinger.  James Schlinkman ("Schlinkman"), a purported witness to the accident, admitted to police on November 12, 2012, that he was travelling seventy (70) miles per hour behind West's vehicle and that he was not gaining ground on her Passat.  Dissinger's

affidavit of probable cause was knowingly contrived to create the false impression for Judge Miller that West was operating her Passat within the posted speed limit.

28.     Second, West was operating her vehicle under the influence of heroin and other prescription medication, and that a burnt spoon used for heating heroin was found in her purse at the crash site.  West's front seat passenger, Joshua West, was also under the influence of morphine, if not heroin, at the time of the crash.

29.     Defendant Dissinger and Defendant Brown's decision to conceal, withhold and/or omit the foregoing from Judge Miller was made to prevent him from considering West's unlawful conduct and culpability in rendering his decision relating to probable cause to charge Noviho.  Had Judge Miller known the truth about the crash, he may have determined that West's speed and drug-impaired state prevented her from perceiving and avoiding the collision with Noviho's vehicle.

30.     Third, that West made no effort to brake or take any evasive action before the crash.  Rather, she drove her Passat straight into the rear of Noviho's tractor at seventy (70) miles per hour.  Defendants Dissinger and Brown elected to tell Judge Miller only that West did not have time to appropriately perceive and react to Noviho's tractor.  There is a huge difference between telling Judge Miller that West did not have time to appropriately perceive and react to Noviho's tractor and telling him that West failed to do anything to avoid the crash.  Judge Miller

may well have determined that West's total failure to brake or attempt to initiate any evasive maneuver was caused by West's excessive speed and illegal drug use. After all, without regard to whatever lights may or may not have been illuminated on Noviho's tractor, West was operating her Passat with her headlights on and Noviho's tractor had reflectors and red and white reflective tape as required by federal regulation. Defendants Dissinger and Brown knew, based on prior experience, that the federally mandated reflectors and red and white reflective tape can be perceived at distances in excess of one thousand (1000) feet, more than three (3) football fields, by an unimpaired and alert driver.

31.    Fourth, that West's children were not properly restrained and/or secured in safety or booster seats as mandated by Pennsylvania law. Despite the foregoing, Defendants Dissinger and Brown contrived their affidavit of probable cause to create the knowingly false impression that West's children were properly restrained. They did so to prevent Judge Miller from considering West's culpability for the crash. Specifically, they represented to Judge Miller that Joshua Charles West "was in a child safety seat in the right rear passenger seat" and Jocelyn Marie West "was in a booster seat in the left rear passenger's seat" at the time of the crash. While literally true, Defendants Dissinger and Brown intentionally failed to advise Judge Miller of the material fact that neither child's seat was secured in any way to the Passat and that Joshua Charles West suffered

13

depressed skull fractures and other fatal injuries when the force of the crash propelled his unsecured car seat into the rear of Joshua West's front passenger seat. Had Judge Miller been advised of the truth regarding the car seats and the cause of Joshua Charles West's death, he may have determined that West, not Noviho, was legally culpable for the deaths of her two (2) family members.

32.     Fifth, that three (3) witnesses (Schlinkman, Guerrier and Noviho) advised police on November 12, 2012 that a woman at the crash scene reported that West's Passat was travelling erratically and at an excessive rate of speed prior to the crash.  Defendants Dissinger and Brown decided to conceal, withhold and/or omit that fact from Judge Miller to shield West's culpability from judicial scrutiny in this matter.

33.     Sixth, that Defendant Dissinger presented as unchallenged the averment to Judge Miller that Noviho's vehicle was travelling in total darkness on State Route 222 without any headlights, taillights or other illumination.   In contrast, both Noviho and Guerrier represented to the police on November 12, 2012 -- the only time law enforcement spoke to either of them before the June 7, 2013 charges were filed -- that the tractor's headlights and taillights were illuminated at all times with respect to the crash and that the tractor's four-way flashers were engaged while Noviho was driving on the right-hand shoulder of State Route 222.  Defendant Dissinger did so by accepting as true the statements of

three (3) purported witnesses, West, Schlinkman and Schlinkman's sister, Michelle Levitsky, and rejecting as false the statements of Noviho and Guerrier. However, Defendants Dissinger and Brown knew by June 7, 2013 that neither West, Schlinkman nor Levitsky were credible, consistent or otherwise worthy of belief. Moreover, on significant issues, their statements were inherently irreconcilable.

34.    Although law enforcement only spoke to Noviho at Lancaster General Hospital on the evening of November 12, 2012 before charging him on June 7, 2013, law enforcement met with West, Schlinkman and Levitsky multiple times during the "investigation" and subsequent criminal prosecution. During those meetings, the statements of the witnesses changed on material issues but Defendants Dissinger and Brown elected to ignore same, just as they elected to conceal from Judge Miller the statements of Noviho and Guerrier. Additionally, Defendant Brown and West's and the Martin family's civil lawyer communicated regularly throughout the investigation and Noviho's criminal proceedings.

**D.    As of June 7, 2013, Defendants Dissinger and Brown knew that West, Schlinkman and Levitsky were not credible or worthy of Belief**

1.    **West**

35.    Starting with her initial interview with law enforcement on November 12, 2012, West began telling a series of lies that by June 7, 2013, Defendants Dissinger and Brown knew were false. For example, on November 16, 2012, she

told Detective Berntheizel that she never took her children with her to pick-up her husband -- except on November 12, 2012.  However, Joshua West's boss, Donald Gochenaur, confirmed for law enforcement that West regularly picked up Joshua West after work and their children were always in the car with her.  West was never confronted with the foregoing inconsistency.  More significantly, West told law enforcement that she recalled getting on State Route 222 and the next thing she recalled was being upside down and she did not know how that happened.  The foregoing was the only interview conducted of West without West's and the Martin family's personal injury lawyer being present.  Significantly, after her civil attorney appears, West's story materially changed but law enforcement never confronted West about her new-found recollection.

36.    On December 20, 2012 and December 21, 2012, law enforcement interviewed West.  West's father, a retired law enforcement officer, and West's civil attorney were present for the interviews.  At that time, West suddenly recalled "something hit her or she hit something that was like black out of nowhere."

37.    West also advised Detectives Schultz and Berntheizel that all four (4) occupants of the Passat were properly belted and restrained.  In that regard, West indicated that the car/safety seats were properly secured to the car and her children were always buckled in.  Based on law enforcement's physical inspection of the Passat, Defendants Dissinger and Brown knew that West's statements were false

but she was never confronted with same.  Finally, West advised the detectives that she had not used heroin since early 2012.

38.    On May 10, 2013, Defendant Dissinger and Detective Schultz re-interviewed West with the Martin family's civil attorney.  At that time, West maintained her position that she had not used heroin on the day of the crash.  She did, however, change her initial story by acknowledging that she had last used heroin on September 6, 2012, during a one week relapse in her recovery.  At the time West changed her story, Defendants Dissinger and Brown knew that West's statement was false because blood tests confirmed that West used heroin shortly before the crash.  Significantly, at this interview, West could no longer recall the crash.  She only remembered that it was raining (which it was not) and that when she woke up she was upside down.

39.    During her May 10, 2013 re-interview, West advised Defendant Dissinger and Detective Schultz that shortly before the crash she recalled a car passing her on the left.  However, despite her headlights and the headlights from that passing car, West continued to maintain that she did not see any lights or reflectors to her front as she continued northbound.

40.    In further support of Noviho's belief that West used heroin on the day of the crash, Defendants Dissinger and Brown knew that Donald Gochenaur paid Joshua West $100.00 in cash for his work on November 12, 2012.  They also knew

17

that Gochenaur gave Joshua West $40.00-$50.00 to pick up some things for the following day.  Although Joshua West was in possession of at least $140.00 when they left the job site in the Passat, only $21.00 was recovered from his wallet when his personal effects were inventoried.  Based on West's interview of December 20, 2012, Defendants Dissinger and Brown were told that the Wests went from the job site to a local Turkey Hill for gas and coffee before they all went to eat at McDonalds.  As per West, they made no other stops.  At her May 10, 2013 interview, West's story somewhat changed.  Now, West's first stop was a local Gulf station, not Turkey Hill, for gas and cigarettes, not coffee and gas.  Additionally, West stated that only the two (2) children ate at the McDonalds.  Whichever account is correct, West and her husband did not spend more than $120.00 at those two stops.  Although West denied making any other stops prior to the crash, upon information and belief, West and Joshua West made another stop where they purchased and used heroin.  That additional stop explains the missing money in Joshua West's wallet and the presence of heroin in West's blood at the time of the crash.

2. **Schlinkman and Levitsky**

41.    As previously stated, Schlinkman purports to have witnessed the crash between West and Noviho.  In that regard, Schlinkman indicated to law enforcement that he witnessed the crash, checked on the condition of the Passat

18

occupants before deferring to an EMT who arrived on scene, and directed a woman to tell the operator of the truck to remain at the crash site.  He also claimed to have heard a woman at the crash scene say that the Passat was speeding and being operated in an erratic manner prior to the crash.  Schlickman left the crash site as first responders were arriving because he was concerned that his black vehicle, which was parked in the grass median, could be hit.

42.    When Schlickman arrived at his destination -- his mother's home -- he called the Manheim Township Police Department to report that he witnessed the crash.  He reported to Sargent Melhorn that Noviho's truck had been on the shoulder of State Route 222 and was in the process of re-entering the road shortly before the crash.  He also reported that the truck did not have any lights on and was travelling very slowly.  Sargent Melhorn promptly dispatched Detective Brian Freysz to interview Schlinkman.  Sargent Melhorn also contacted Detectives Dissinger and Beck at Lancaster General Hospital to advise them about his discussion with Schlinkman.  Based on Saregnt Melhorn's update, the detectives re-interviewed Noviho and Guerrier.   During the re-interview, Guerrier acknowledged that they had pulled off the road to flip the above-referenced switches but they had re-entered the right lane of State Route 222 prior to the crash.   He also re-confirmed that the truck's headlights and taillights were illuminated at all times related to their re-entry onto State Route 222.

43.    At approximately 10:30 p.m. on November 12, 2012, Detective Freysz interviewed Schlinkman.  At that time, Schlinkman advised the detective that he was travelling seventy (70) miles per hour in the left-hand lane about one hundred (100) yards behind West's Passat at the time of the crash.  He also stated that he was not gaining any ground on the Passat so he was in the process of moving to the right lane when the crash occurred.

44.    While Schlinkman, at all times, reported that he did not see any lights, red and white reflective tape or other reflectors on the tractor prior to the crash, his recall of the crash has varied considerably through the investigation and criminal trial of Noviho.

45.    Schlinkman's first material shift of position occurred between the time he first spoke to Sargent Melhorn and his interview shortly thereafter with Detective Freysz.  At that interview, rather than maintaining his position that Noviho's tractor was slowly re-entering the roadway from the right shoulder of State Route 222, Schlinkman told Detective Freysz that the first time he saw the truck it was squarely in the right-hand lane and he believed the truck was standing still.  Schlinkman disavowed any knowledge of seeing the truck on the shoulder or as it re-entered State Route 222.  But for Schlinkman's initial report, Detectives Dissinger and Beck would have had no reason to re-interview Noviho and Guerrier.  Upon information and belief, Schlinkman's story changed to shorten the

20

period of time that he -- and West -- had to perceive Noviho's tractor and react accordingly.

46.    Over time, Schlinkman's representations regarding his distance from the Passat at the time of the crash also materially changed.  From his initial one hundred (100) yard estimate, Schlinkman went to fifty (50) yards, to no more than forty (40) yards to ultimately being nearly side by side the Passat at the time of the crash.  Because he was giving law enforcement what Defendants wanted, Schlinkman was never challenged regarding his inconsistencies and Judge Miller was never advised of same.

47.    On another material issue, Schlinkman rejected the suggestion that there were other northbound cars ahead of him, West and Noviho's tractor.  By doing so, Schlinkman portrayed the scene as very, very dark and the only lights able to illuminate the area were West's and his.  Schlinkman's recollection is at odds with Noviho, Guerrier and, more importantly, West, all of whom place another northbound vehicle ahead of Schlinkman and West.  Upon information and belief, the headlights of that passing vehicle illuminated Noviho's tractor on the shoulder of State Route 222 as Schlinkman initially reported to law enforcement.

48.    Schlinkman's recollection that he did not see the truck until he was immediately upon it and West's Passat was flipping in the air as he passed it in the left lane cannot be reconciled with the facts.  Schlinkman indicated that he came to

21

a controlled stop and pulled into a grass median approximately forty (40) to fifty (50) yards beyond the crash site. Schlinkman could not have done so within that forty (40) to fifty (50) yard distance given his seventy (70) mile per hour speed at the time of the crash.

49.     Schlinkman was also insistent that Noviho's truck did not have working headlights, taillights, red and white reflective tape or other reflectors. Again, Schlinkman's recollection is inconsistent with the facts.    Law enforcement's inspection of the truck revealed both reflectors and red and white reflective tape on the truck.  On the tractor that Noviho was driving, the red and white reflective tape is on the top and entire perimeter of the tractor but the reflectors and taillights are low and centered between the tires.  As such, if Schlinkman was travelling one hundred (100) yards behind West in the left lane -- or even fifty (50) yards -- it is more probable than not that West's Passat would have blocked any view by Schlinkman of the truck's reflectors or taillights.  As to the reflective tape, despite Schlinkman's claim that the tractor had none, Defendants Dissinger and Brown knew that the tractor had more red and white reflective tape than was required by federal regulation.  Schlinkman was either too far behind the Passat to view the tape, he was not paying attention to the roadway ahead, or, for reasons unknown to Noviho, his oft-changing account of the crash was false, intentionally or otherwise.

50.   Finally, Schlinkman's flip-flopping regarding his sister's knowledge of the crash further undermines his credibility.   Specifically, like her brother, Michelle Levitsky ("Levitsky") was travelling home on State Route 222 after having had dinner at a local restaurant with her husband, mother and Schlinkman on November 12, 2012.   She was behind her brother.   Levitsky also stopped at the crash site.   At all times prior to Noviho's arrest, Schlinkman told law enforcement that his sister and brother-in-law were too far behind him on State Route 222 to have witnessed the crash.   However, when Levitsky was finally interviewed by law enforcement months after the crash, she indicated that she was two (2) to three (3) car lengths behind the Passat when she saw and heard the crash.   She even told law enforcement that she had to take evasive action to avoid a collision.   She then told law enforcement that her brother was ahead of her on State Route 222 but she did not know how far ahead.   Defendants Dissinger and Brown never confronted Schlinkman or Levitsky with their inconsistent and irreconcilable accounts. Similarly, they concealed the same from Judge Miller.

51.   Schlinkman's response to Levitsky's account was to, once again, change his story.   At the preliminary hearing, Schlinkman testified that Levitsky was behind him but he did not know how far behind she was.   Then, when Levitsky finally testified in this matter, she abandoned her earlier position that she

23

both saw and heard the crash from a distance of two (2) to three (3) car lengths and testified that she was too far behind her brother to see the crash.

### COUNT I
### 42 U.S.C. § 1983
### Unlawful Seizure/Wrongful Arrest - False Imprisonment
### Plaintiff v. Defendant Dissinger

52.   The preceding paragraphs of this Complaint are incorporated herein by reference as though fully set forth.

53.   As set forth more fully above, Noviho was arrested and detained by Defendant Dissinger after being charged with the serious criminal offenses identified above.   Noviho's arrest and detainment constitute a seizure and/or deprivation of liberty within the meaning of the Fourth Amendment to the United States Constitution.

54.   At all times relevant to conduct complained of herein, Defendant Dissinger acted in his individual capacity and under color of state law.  Moreover, Defendant Dissinger personally directed, participated, assisted, knew of, ratified and/or acquiesced in said conduct.

55.   As further set forth more fully above, Noviho's arrest and detainment were initiated without probable cause in that the facts and circumstances available to Defendant Dissinger were clearly insufficient to warrant a reasonably prudent officer to believe that Noviho committed the serious and stigmatizing criminal offenses for which he was so charged.  In fact, Defendant Dissnger was supposed

to be specially trained in criminal investigations, interview and interrogation techniques, and statement analysis and, pursuant to that training, should have known that there was no basis to arrest and detain Noviho under said facts and circumstances.

56.     Because he was aware that he had no basis in law or fact to initiate criminal proceedings against Noviho, Defendant Dissinger crafted an affidavit of probable cause wherein he knowingly and/or deliberately, or with a reckless disregard for the truth, concealed/omitted/ignored/withheld material facts and/or exculpatory/contradictory evidence while, at the same time, including statements that he knew or should have known were false and/or not credible or trustworthy, for the sole purpose of procuring the unlawful arrest of Noviho for which he otherwise lacked probable cause.  The manner in which he did so is set forth in greater and specific detail above.

57.     In fact, the evidence of record demonstrates that Defendant Dissinger inserted into the affidavit of probable cause only those facts which were allegedly incriminating to Noviho, and then concealed, ignored, withheld and/or omitted all of the inconsistencies, material facts and/or exculpatory/contradictory evidence which tended to prove Noviho's innocence.

58.     Defendant Dissinger did so for the purpose of convincing a magistrate judge to issue a warrant for Noviho's arrest.

59.     Indeed, any reasonable person would know that a judge would want to know and/or be made aware of said inconsistencies, material facts and/or exculpatory/contradictory evidence in making a probable cause determination for Noviho's arrest.

60.     To protect against the danger of unlawful arrest, it is well-established that investigative officers cannot make unilateral decisions about the materiality of information or, after satisfying himself that probable cause exists, merely inform the magistrate or judge of inculpatory evidence.

61.     Likewise, an investigative officer contemplating an arrest is not free to disregard plainly exculpatory and contradictory evidence, even if substantial inculpatory evidence, standing by itself, suggests that probable cause exists.

62.     Defendant Dissinger's conduct as aforesaid constitutes an unlawful seizure and/or false imprisonment in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

63.     Noviho's constitutional right not to be arrested and/or detained without probable cause was clearly established and known by Defendant Dissinger at all times relevant to the conduct giving rise this action.

64.     The Approved box for the Office of the Attorney for the Commonwealth was checked solely to satisfy department and/or county policy.

65.     Moreover, Defendant Dissinger's unlawful arrest and/or detainment was willful, wanton, malicious and taken with a reckless or callous disregard for Noviho's clearly established constitutional rights as aforesaid.

66.     As a direct and proximate result of Defendant Dissinger's violations as aforesaid, Noviho has suffered -- and continues to suffer -- substantial damages and life-altering effects.

WHEREFORE, Plaintiff Mawuyrayrassuna Emmanuel Noviho demands judgment on this Count in his favor and against Defendant Dissinger, together with compensatory and punitive damages, interest, costs of suit, attorneys' fees and such other and further relief to which this Court deems just and proper.

## COUNT II
## 42 U.S.C. § 1983
### Unlawful Seizure/Wrongful Arrest – False Imprisonment
### Plaintiff v. Defendant Brown (Investigative Capacity Only)

67.     The preceding paragraphs of this Complaint are incorporated herein by reference as though fully set forth.

68.     As set forth more fully above, Noviho was arrested and detained after being charged with the serious criminal offenses identified above.  Noviho's arrest and detainment constitute a seizure and/or deprivation of liberty within the meaning of the Fourth Amendment to the United States Constitution.

69.     The claim advanced against Defendant Brown in this Count is not based on any acts and/or missions of Defendant Brown during the post-arrest

prosecution of Noviho. Rather, said claim is based on the acts and/or omissions of Defendant Brown during his pre-arrest investigation into the criminal offenses eventually filed against Noviho.

70. As set forth more fully above, Defendant Brown served as an Assistant District Attorney of Lancaster County assigned to handle all aspects of the investigation into the events in question, including the preliminary investigation prior to the initiation of any criminal charges against Noviho.

71. At all times during his preliminary investigation, Defendant Brown acted in his individual capacity, under color of state law and within the course and scope of his investigatory duties as an Assistant District Attorney of Lancaster County.

72. Defendant Brown was directly responsible for all aspects of the preliminary investigation, including the assignment, control, oversight and supervision of the other law enforcement personnel that were involved in said investigation.

73. In fact, because of the high-profile nature of the case, Defendant Brown played an active role in the investigation of Noviho, and was at all times consulted and kept informed of every aspect of the investigation as it developed, including the information, statements and/or other evidence obtained by law enforcement personnel.

74.   More importantly, Defendant Brown actively participated, collaborated and/or assisted other law enforcement personnel in discussing and reviewing the evidence and, together, made a collective decision about whether there was probable cause to make an arrest and what information should be included in the Affidavit of Probable Cause prior to the initiation of any criminal proceedings against Noviho.

75.   In his capacity as an investigator, Defendant Brown likewise knowingly and/or deliberately, or with a reckless disregard for the truth, concealed/ignored/withheld/omitted material facts and/or exculpatory and/or contradictory evidence from the Affidavit of Probable Cause, while at the same time, including statements that he knew or should have known were false or not credible or trustworthy, for the sole purpose of procuring the unlawful arrest of Noviho for which he otherwise lacked probable cause.  The manner in which he did so is set forth in greater and specific detail above.

76.   In fact, the evidence of record demonstrates that Defendant Brown knew that the affidavit of probable cause contained only those facts which were allegedly incriminating to Noviho, but concealed, ignored, withheld and/or omitted all of the inconsistencies, material facts and/or exculpatory/contradictory evidence which tended to prove Noviho's innocence.

77. Defendant Brown knew that this would convince a magistrate judge to issue a warrant for Noviho's arrest.

78. Indeed, any reasonable person would know that a judge would want to know and/or be made aware of said inconsistencies, material facts and/or exculpatory/contradictory evidence in making a probable cause determination for Noviho's arrest.

79. To protect against the danger of unlawful arrest, it is well-established that investigative officers cannot make unilateral decisions about the materiality of information or, after satisfying himself that probable cause exists, merely inform the magistrate or judge of inculpatory evidence.

80. Likewise, an investigative officer contemplating an arrest is not free to disregard plainly exculpatory and contradictory evidence, even if substantial inculpatory evidence, standing by itself, suggests that probable cause exists.

81. Defendant Brown's conduct as aforesaid constitutes an unlawful seizure in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

82. Noviho's constitutional rights as aforesaid were clearly established and known by Defendant Brown at all times relevant to the conduct giving rise this action.

83.     Moreover, Defendant Brown's conduct as aforesaid was willful, wanton, malicious and taken with a reckless or callous disregard for Noviho's clearly established constitutional rights.

84.     As a direct and proximate result of Defendant Brown's violations as aforesaid, Noviho has suffered -- and continues to suffer -- substantial damages and life-altering effects.

WHEREFORE, Plaintiff Mawuyrayrassuna Emmanuel Noviho demands judgment on this Count in his favor and against Defendant Brown, together with compensatory and punitive damages, interest, costs of suit, attorneys' fees and such other and further relief to which this Court deems just and proper.

## COUNT III
### 42 U.S.C. § 1983
### Malicious Prosecution
### Plaintiff v. Defendant Dissinger

85.     The preceding paragraphs of this Complaint are incorporated herein by reference as though fully set forth.

86.     As set forth more fully above, Defendant Dissinger initiated criminal proceedings against Noviho by preparing, filing and/or presenting a sworn and signed criminal complaint and affidavit of probable cause against Noviho charging him with the criminal offenses identified above.

87.    As a consequence of the criminal proceedings initiated by Defendant Dissinger, Noviho suffered a seizure and/or deprivation of his liberty within the meaning of the Fourth Amendment to the United States Constitution.

88.    At all times relevant to conduct complained of herein, Defendant Dissinger acted in his individual capacity and under color of state law.  Moreover, Defendant Dissinger personally directed, participated, assisted, knew of, ratified and/or acquiesced in the criminal proceedings initiated against Noviho.

89.    As further set forth more fully above, Defendant Dissinger initiated the criminal proceedings against Noviho without probable cause in that the facts and circumstances available to Defendant Dissinger were clearly insufficient to warrant a reasonably prudent officer in believing that Noviho committed the serious and stigmatizing criminal offenses for which he was so charged.  In fact, Defendant Dissinger was supposed to be specially trained in criminal investigations, interview and interrogation techniques, and statement analysis and, pursuant to that training, should have known that there was no basis to initiate criminal proceedings against Noviho under said facts and circumstances.

90.    Because he was aware that he had no basis in law or fact to initiate criminal proceedings against Noviho, Defendant Dissinger crafted an affidavit of probable cause wherein he knowingly and/or deliberately, or with a reckless disregard for the truth, concealed/ignored/withheld/omitted material facts and/or

exculpatory/contradictory evidence while, at the same time, including statements that he knew or should have known were false or not credible or trustworthy, for the sole purpose of procuring the unlawful arrest and prosecution of Noviho for which he otherwise lacked probable cause.  The manner in which he did so is set forth in greater and specific detail above.

91.    In fact, the evidence of record demonstrates that Defendant Dissinger inserted into the affidavit of probable cause only those facts which were allegedly incriminating to Noviho, and then concealed, ignored, withheld and/or omitted all of the inconsistencies, material facts and/or exculpatory/contradictory evidence which tended to prove Noviho's innocence.

92.    Defendant Dissinger did so for the purpose of convincing a magistrate judge to issue a warrant for Noviho's arrest.

93.    Indeed, any reasonable person would know that a judge would want to know and/or be made aware of said inconsistencies, material facts and/or exculpatory/contradictory evidence in making a probable cause determination for Noviho's arrest.

94.    To protect against the danger of unlawful arrest, it is well-established that investigative officers cannot make unilateral decisions about the materiality of information or, after satisfying himself that probable cause exists, merely inform the magistrate or judge of inculpatory evidence.

33

95.     Likewise, an investigative officer contemplating an arrest is not free to disregard plainly exculpatory and contradictory evidence, even if substantial inculpatory evidence, standing by itself, suggests that probable cause exists.

96.     By initiating said criminal proceedings against Noviho without probable cause under the aforesaid circumstances and in the aforesaid manner, Defendant Dissinger acted maliciously towards Noviho or, for the reasons stated above, for a purpose other than bringing Noviho to justice.

97.     Indeed, it is well-established that malice may be inferred from the absence of probable cause.

98.     Moreover, as referenced above, the criminal proceedings initiated against Noviho by Defendant Dissinger ultimately terminated in Noviho's favor.

99.     Defendant Dissinger's conduct as aforesaid constitutes a malicious prosecution in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

100.    Noviho's constitutional right to be free from malicious prosecution was clearly established and known by Defendant Dissinger at all times relevant to the conduct giving rise this action.

101.    The Approved box for the Office of the Attorney for the Commonwealth was checked solely to satisfy department and/or county policy.

102.   Moreover, Defendant Dissinger's unlawful conduct was willful, wanton, malicious and taken with a reckless or callous disregard for Noviho's clearly established constitutional rights as aforesaid.

103.   As a direct and proximate result of Defendant Dissinger's violations as aforesaid, Noviho has suffered -- and continues to suffer -- substantial damages and life-altering effects.

WHEREFORE, Plaintiff Mawuyrayrassuna Emmanuel Noviho demands judgment on this Count in his favor and against Defendant Dissinger, together with compensatory and punitive damages, interest, costs of suit, attorneys' fees and such other and further relief to which this Court deems just and proper.

**COUNT IV**
**42 U.S.C. § 1983**
**Conspiracy to Violate Civil Rights**
**Unlawful Seizure/Wrongful Arrest – False Imprisonment**
**Plaintiff v. Defendants Dissinger, Brown (Investigative Capacity Only) &**
**<u>Martin</u>**

104.   The preceding paragraphs of this Complaint are incorporated herein by reference as though fully set forth.

105.   In the manners set forth more fully above, Defendants Dissinger, Brown and Martin conspired to violate Noviho's constitutional rights under the Fourth Amendment to be free from unlawful seizure.

106.   During the seven (7) month investigation starting in November 2012 and prior to the filing of charges against Noviho in June 2013, Defendant Martin

exerted his political influence and control over Defendants Brown and Dissinger and, in doing so, each conspired, plotted, agreed and/or understood that no criminal charges would be filed against Defendant Martin's sister, West.  Instead, they each plotted, planned, agreed and/or understood that criminal charges would be filed against Noviho despite the lack of probable cause to do so.

107.  This agreement, plot, plan and/or understanding would insulate Defendant Martin's sister from judicial and public scrutiny, while at the same time enhancing the value of her civil action as stated move fully above, all at the unfortunate expense of Noviho.

108.  At all times relevant to the aforesaid conspiracy, Defendants Dissinger, Brown and Martin acted in concert/nexus with one another and/or jointly participated in, directed, assisted, knew of, ratified or acquiesced in all acts committed in furtherance of said conspiracy.

109.  More specifically, Defendants Dissinger, Brown and Martin were each voluntary participants in the conspiracy, understood the general objectives of the plan, and then agreed, either explicitly or implicitly, to do their part and take acts to further those objectives.   Where there was a duty to act, Defendants Dissinger, Brown and Martin refrained from acting in a manner intended to facilitate the plan/conspiracy.

36

110.   The acts and/or omissions of Defendants Dissinger, Brown and Martin as aforesaid constitute a wrongful combination or agreement to deprive Noviho of his clearly established constitutional rights as aforesaid.

111.   Moreover, at all times relevant hereto, the conspiratorial conduct engaged in by Defendants Dissinger, Brown and Martin was willful, wanton, malicious and taken with a reckless or callous disregard for Noviho's constitutional rights as aforesaid.

112.   As a direct and proximate result of the conspiratorial acts of the Defendants Dissinger, Brown and Martin as aforesaid, Noviho has suffered -- and continues to suffer -- substantial damages and life-altering effects.

WHEREFORE, Plaintiff Mawuyrayrassuna Emmanuel Noviho demands judgment on this Count in his favor and against Defendants Dissinger, Brown and Martin, jointly and/or severally, together with compensatory and punitive damages, interest, costs of suit, attorneys' fees and such other and further relief to which this Court deems just and proper.

### COUNT V
### 42 U.S.C. § 1983
### Conspiracy to Violate Civil Rights
### Malicious Prosecution
### Plaintiff v. Defendants Dissinger & Martin

113.   The preceding paragraphs of this Complaint are incorporated herein by reference as though fully set forth.

114.   In the manners set forth more fully above, Defendants Dissinger and Martin conspired to violate Noviho's constitutional rights under the Fourth Amendment to be free from malicious prosecution.

115.   During the seven (7) month investigation starting in November and prior to the filing of charges against Noviho in June, Defendant Martin exerted his political influence and control over Defendant Dissinger and, in doing so, they conspired, plotted, agreed and/or understood that no criminal charges would be filed against Defendant Martin's sister, West.   Instead, they plotted, planned, agreed and/or understood that criminal charges would be filed against Noviho despite the lack of probable cause to do so.

116.   This agreement, plot, plan and/or understanding would insulate Defendant Martin's sister from judicial and public scrutiny, while at the same time enhancing the value of her civil action as stated move fully above, all at the unfortunate expense of Noviho.

117.   At all times relevant to the aforesaid conspiracy, Defendants Dissinger and Martin acted in concert/nexus with one another and/or jointly participated in, directed, assisted, knew of, ratified or acquiesced in all acts committed in furtherance of said conspiracy.

118. More specifically, Defendants Dissinger and Martin were each voluntary participants in the conspiracy, understood the general objectives of the

plan, and then agreed, either explicitly or implicitly, to do their part and take acts to further those objectives.  Where there was a duty to act, Defendants Dissinger, and Martin refrained from acting in a manner intended to facilitate the plan/conspiracy.

119.   The acts and/or omissions of Defendants Dissinger and Martin as aforesaid constitute a wrongful combination or agreement to deprive Noviho of his clearly established constitutional rights as aforesaid.

120.   Moreover, at all times relevant hereto, the conspiratorial conduct engaged in by Defendants Dissinger and Martin was willful, wanton, malicious and taken with a reckless or callous disregard for Noviho's constitutional rights as aforesaid.

121.   As a direct and proximate result of the conspiratorial acts of the Defendants Dissinger and Martin as aforesaid, Noviho has suffered -- and continues to suffer -- substantial damages and life-altering effects.

WHEREFORE, Plaintiff Mawuyrayrassuna Emmanuel Noviho demands judgment on this Count in his favor and against Defendants Dissinger and Martin, jointly and/or severally, together with compensatory and punitive damages, interest, costs of suit, attorneys' fees and such other and further relief to which this Court deems just and proper.

**COUNT VI**
**42 U.S.C. § 1983**
*Monell* **Liability Based on Act Policymaker**
**Plaintiff v. Defendant Lancaster County**

122.   The preceding paragraphs of this Complaint are incorporated herein by reference as though fully set forth.

123.   As referenced above, Defendant Martin at all times served as an elected Commissioner of Lancaster County and, in that capacity, at all times acted as a duly authorized policymaker of Lancaster County for purposes of municipal liability.  At all times relevant hereto, Defendant Martin personally participated in, acted in concert with, directed, assisted, knew of, ratified and/or acquiesced in the misconduct complained of herein.

124.   It is well-established that municipal liability exists when a claim is predicated upon the actions or inactions of a municipality's duly authorized policymakers.

125.   To this end, the claim advanced against Lancaster County in this Count is not based on a theory of Respondeat Superior.  Rather, said claim is based on the acts and/or omissions of Defendant Martin in his capacity as a policymaker for Lancaster County as set forth in detail above.

126.   Accordingly, Lancaster County is subject to liability for the aforesaid acts or omissions of Defendant Martin in his capacity as a duly authorized policymaker of Lancaster County.

WHEREFORE, Plaintiff Mawuyrayrassuna Emmanuel Noviho demands judgment on this Count in his favor and against Defendant Lancaster County, together with compensatory damages, interest, cost of suit, attorneys' fees, and such other and further relief to which this Court deems just and proper.

Respectfully submitted,

**WRIGHT & REIHNER, P.C.**

By: George A. Reihner
Frank J. Tunis, Jr.
148 Adams Avenue
Scranton, PA  18503
(570) 961-1166
(570) 961-1199 – fax

Dated: June 5, 2015                    Attorneys for Plaintiff